## KELLEY v. STATE.

CIVIL RIGHTS BILL.—*colored witnesses.* The Civil Rights Bill is *constitutional.*

On the 25th of October, 1866, a *colored man* was a competent witness against a white man in a criminal case.

CRIMINAL EVIDENCE—*where christian name is unknown.* The allegation in an indictment that the christian name of the defendant is to the grand jurors unknown is not a *material* one ; and it is sufficient to identify the defendant as the person whom the grand jurors intended to present.

RIGHT OF SECESSION. *No State* has the right to *secede* from the Union.

The *judicial* must follow the decision of the *political* department as to the political status of a State.

The General Government is bound to secure to every State of the Union a *republican* form of government.

The effect of the *rebellion* was to destroy the existing State Government.

*Error to Pulaski Circuit Court.*

Hon. LIBERTY BARTLETT, Circuit Judge.

FARR & VAUGHAN, for plaintiff.

The court below erred in permitting negroes to testify against the defendant, a white man. *Digest of Arkansas,* *p.* 1084.

The Civil Rights Bill did not confer upon the negro the right to testify against the white man, generally, in the State courts. *Civil Rights Bill, sec.* 1.

If it was the intention of Congress to make the negro a competent witness in the State courts, against the white man, the clause is unconstitutional. *Kent's Com., Vol.* 1, *p.* 222, 236, 364 ; *Caller v. Bull,* 3 *Dallas,* 386 ; *Sturges v. Crowenshield,* 4 *Wheat.,* 193 ; *Campbell v. Morris,* 3 *Harris & McHenry's Rep., p.* 554.

If Congress had the power to make the negro a citizen of the United States, it does not follow that, *ipso facto*, he is a citizen of any State to which he may go. *Abbott v. Baily*, 6 *Pick.*, *p*. 2. See, also, opinion of Judge CURTIS, in the Dred Scott case, 19 *Howard*.

The circuit court erred in refusing to give instructions asked for by defendant. The allegation in the indictment that the first or christian name of the defendant was unknown was a material averment, traversed by the plea of not guilty, and should have been proven. *Wharton's Crim. Law*, *vol.* 1, 243; *Cameron v. State*, 13 *Ark.*, 718.

JORDAN, Attorney General, for appellee.

The act of Congress of April 9, 1866, (called the Civil Rights Bill,) declares who are citizens of the United States and their rights and liabilities.

The statutes of this State restricting the colored person to giving evidence against persons of his own color, or in a case where the State is plaintiff and such person defendant, is repealed by such act. The law of Congress is the supreme law of the land. *Art.* 6, *sec.* 2, *Con. U. S.*

The court did not err in refusing to give the instruction asked for by defendant on the ground that it was irrelevant; if relevant, it could only be applied to the allegation in the indictment that the first or christian name of the party injured was to the grand jury unknown, and not to the defendant.

GREGG, J.

At the October term, 1866, of the Pulaski circuit court, the appellant, and one Phillips, were jointly indicted for robbery. The indictment charges that one "Kelley, and one Phillips, whose christian or first names are unknown to the grand jurors," &c. On the 27th day of the same month, both the defendants, in person, and by attorney, appeared in the circuit

court, and, upon the application of Phillips, his case was continued; and the defendant, Kelley, had hearing of the indictment, and interposed his plea of "not guilty;" to which the State joined issue. A jury was impaneled, and after being sworn, &c., returned a verdict of "guilty," and assessed the appellant's punishment at five years imprisonment; upon which verdict the court sentenced him to undergo imprisonment the time stated.

During the trial, the State offered to introduce as a witness Edward Armstead, a colored man, and the party alleged to be injured. The appellants objected to his being sworn, or giving evidence, upon the ground that he was a black man, of the African or negro race, and the appellant was a white man. The court overruled the objection, and allowed the colored man to be sworn and to testify against the appellant; to which he excepted. Other colored witnesses were allowed to testify against the appellant, over his objections, to which he likewise excepted.

The record states that "all the material allegations of the indictment were proved, except the allegation that the christian or first name of said Kelley was unknown to the grand jurors; and as to that allegation the State introduced no evidence." The appellant asked the court to instruct the jury that said allegation was a material one, and that it devolved upon the State to prove the same. The court refused to so charge the jury, and charged them "that if the defendant, Kelley, was identified as the same person against whom the grand jurors found the indictment, it was sufficient;" to which ruling of the court the appellant excepted.

The appellant's counsel here insist that the allegation, charging that Kelley's christian or first name was unknown, requires the same proof as an allegation charging that the christian name of a person injured was unknown.

We hold the allegations quite different. The plea of not guilty effectually denies an injury to a person unknown to the jury, and before the State can properly ask a conviction she must

introduce proof of all the allegations denied by the plea, and that one charging the assault to have been made upon a person unknown is as descriptive and material as if it charged the assault to have been made upon A. B.; and, in either case, the State must show the assault to have been made upon the person described in her indictment; and when she alleges that he is a stranger, that he is unknown, she must prove that the injury was committed on such individual, or one unknown. *Gabe v. State*, 6 *Ark.*, 540. When a defendant is brought into court by an untrue name, or without any name, and is in person advised of the charges the public have brought against him, he is then selected out, designated from other men, as a guilty agent, and if he does not prefer to answer such charges by the description given him, he can tender his true name, and by proper pleading, compel the State to carrry on her prosecution in his real name ; but if he elects to pass over these formal objections, and at once plead to the merits of the action, he must defend upon the ground assumed, and can not go back and take advantage of any mistake in his name or misdescription of his person. 1 *Arch. Cr. Pr. and Pl.*, 262, *and note;* 1 *Chit. Cr. Law*, 202 ; 1 *Ray,* (*S. C.,*) 378 ; 16 *Mass.*, 146. There was no error in the instructions given by the court.

The remaining question is, " whether, on the 25th day of October, 1866, a colored man, of the African race, was a competent witness against a white man charged with a crime against the public laws of this State?"

The appellant's counsel rely upon the statutes of the State, passed before the breaking out of the late war or the abolition of slavery, by which persons of the African or negro race, whether slave or free, were debarred from testifying before a court in any cause wherein a white person was interested in the result of the suit. *Gould's Dig., chap.* 181, *sec.* 25. They insist that the law passed by the United States Congress, known as the Civil Rights Bill, is unconstitutional, and not binding upon any State court, and that the rights of the

colored man as a witness, in court, are no greater than formerly, and in no way changed by his emancipation, or other recent acts affecting his relationship to the white people.

Counsel insist that one of the exclusive reserved rights of the State is to regulate all proceedings in her courts; to declare who shall be competent witnesses, &c.; that no act of the Convention or Legislature had conferred upon a colored man the right to testify against a white person; that Congress had no constitutional power to do so, and therefore no law was in force under which the court could allow such privilege.

To some extent this inquiry involves the then existing relationship of our State to the General Government, and the authority and powers of the Government under that relationship has been considered.

In reference to the powers and obligation conferred upon the General Government, by the Constitution of the United States, we will refer to paragraph 2, section 1, article 6, of that Constitution, which declares that, "that Constitution, and the laws of the United States made in pursuance thereof, and all treaties made under the authority of the United States, shall be the supreme law of the land, and the judges in every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding." Section 4, article 4: "The United States shall guarantee to every State in this Union a republican form of government, and shall protect each of them against invasion, and on the application of the Legislature, (or the Governor when the Legislature can not be convened,) against domestic violence."

Sec. 8, art. 1: "Congress shall have power to levy and collect taxes, duties, &c., and provide for the common defense and general welfare of the United States; provide for calling forth the militia to execute the laws of the Union; suppress insurrections and repel invasions; to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof."

Art. 10 of amendments of the Constitution: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

In paragraph 3, article 6, it is provided, "that all executive and judicial officers of the several States shall be bound by oath to support the Constitution of the United States."

Thus the fundamental laws of the land require the judiciary of the several States to first obey that Constitution, and the laws of Congress, made in pursuance thereof; and hence our anxiety to ascertain whether the act in question is within the legislative powers of Congress; if so, its force is unquestionable.

We can not concede the right or power of the people of any State to secede, or destroy all relationship between the State and General Government; they have not the power to withdraw the territory of a State from the Government, or the right or power to absolve their allegiance and obligations to that Government, or to prevent that Government from enforcing her laws within the limits of such State. Yet the people have the revolutionary force, the unauthorized power to set aside all State laws; to abolish all State courts; and to trample down the State Constitution and State Government; to place themselves in opposition to the authority and laws of the Federal Government, and by a combined, general, and organized resistance, they may destroy the State Government, and commit treason and war against the United States. Thus, they can not destroy the rights of the Federal Government, but may destroy their organized forms and political relations with the General Government; may destroy the State Government; may destroy all republican forms of government under their Constitution, and place themselves beyond the claim of Federal protection, and thereby necessarily invoke upon them the powers of the Federal Government, put in motion under the provisions in her Constitution, requiring her to suppress insurrections, guarantee to each State a republican form of government. &c.

That Constitution gives to the United States authority to make all laws necessary and proper for carrying into execution all the general and specific powers granted to that government. Under these clauses of the Constitution it could not have been the design of its framers to confer such authority and rights upon the Federal Government without intending the power to carry that authority into effect.

It certainly was not intended that the United States should have the right and authority to call out the militia, without also having the authority and power to enact all needful laws, to clothe, feed and equip them; to determine the requisite number for the emergency, and to direct their movements and operations when in the field. The power being granted, the means requisite to enforce that power necessarily go with it, as well as the right to determine when such power must be exerted, and the means necessary to carry it into effect; otherwise such provisions would be worse than nugatory. The same view is taken of that clause obligating the General Government to guarantee to each State a republican form of government. As the acquisition of *territory*, the *formation* or *recognition* of *new States*, the raising of armies, levying and carrying on war, forming alliances, and making treaties of peace, and other kindred subjects, are confided solely to the political and executive departments of the Government, we hold that the judiciary, in determining an issue at law, have nothing to do with the question as to the political status of any State or country, further than to ascertain and follow the decisions of the political departments of the Government. *Martin v. Mott,* 12 *Wheat.,* 28; *Devina Pastora,* 4 *Wh.,* 52; *ib.,* 497; *Gelston v. Hoyt,* 3 *Wh.,* 323; *United States v. Palmer, et al.,* 3 *Wh.,* 610; *Luther v. Borden,* 7 *Howard* 1; *Jones v. Scott,* 5 *Howard,* 343; *Miss. v. Johnson,* 4 *Wal.,* 475.

The proper political departments must decide whether or not a State has formed a republican State Government; or, if she ever had one so formed, whether or not she has abolished or destroyed it; and, if it is found that a republican State Gov-

ernment does not exist in any State, it then becomes obliga-
tory upon the Federal Government to secure one to such a
State; and when such necessity calls forth action at the hands
of that Government, she must determine what action is neces-
sary to reach the desired end—regulated of course by the gen-
eral provisions of the Constitution. Such powers, in any
department of government, are admitted to be great, and may
be considered dangerous; but such power must be lodged
somewhere.

There can be no stable government without some authority
and power to maintain its several parts, and in ours that power
is in the people, and it is by them temporarily delegated to
chosen representatives, with so frequent recurring elections,
that all administrative policy, not in harmony with the will of
the people, can and will very soon be revolutionized; hence no
safer depository, it is believed, could be had for so great a ne-
cessary power. The existence of a nation requires this enlarged
discretion, and it was certainly wise not to leave it with a re-
mote department like the judiciary, but to keep it within the
narrowest possible grasp of the people.

Now, will it be contended that, at the time the rebel forces
were compelled to acknowledge the superiority of the Federal
power, any government in harmony with the Constitution of
the United States existed in this State? It would seem not.

Some theorists insist that the former laws of the State were
still the law; that secession was void, and void acts can not
affect valid laws, &c.; that the law existed, though no one re-
cognized its being; that it was unknown but not destroyed;
dormant but not dead, &c., &c. But the real question is, not
whether the law was finally destroyed, but whether the State
Government proper had been abolished, set aside or superseded?
Government is an organized form of law, an established form
of law, the system of polity in a State; and if that organized
system in a State is not republican in form, then no republican
government therein exists. When the Constitution that was
framed under that of the United States, and in harmony with

it, was set aside, the laws made under it changed, and other
organizations and forms of law; inconsistent with these
laws and the Federal Constitution, substituted ; when there
was not a voice that would acknowledge the former law ; not an
individual to execute an office, from the highest to the lowest;
not a spring to move any part of the machinery of a once
government—who would say such was a government in being?
Could such a state of things be called a government? It means
nothing like government.

By the will and wicked power of the people they rebelled ;
they attempted to throw off their allegiance to the United
States ; they destroyed the State Government which had been
guaranteed this State, and made other organizations, set up
other forms, instead thereof. The authority and power of the
Federal Government set aside and destroyed these other organ-
izations and forms ; destroyed the pretended government ; and
whether or not the former laws were forever abolished, no
government, in a constitutional sense, then existed. The rebel-
lion set aside and abolished the constitutional government,
with all its varied machinery. Federal power and authority
cut down and destroyed the pretended government that had
been reared upon its ruins ; whether or not the law perished
under these blighting influences of treason and war, it is too
clear that the State had no voice to call that law from its
years of slumber; no power to again move the machinery so
long neglected; no legislature to revive law; no courts to con-
strue and apply it; no executive to enforce it; no legal forms;
no system of State policy; no government. Law and govern-
ment are not synonymous, but the political departments should
determine. The national Executive declared this State in
rebellion ; he moved armies on the State to cut to pieces the
powers in possession of it, and to compel obedience to Federal
mandates; and, it is declared by the most solemn acts of Federal
legislation, that no republican State Government then existed
in this State; that the status of the people and the State, in
its then organized form, was changed—was that of an enemy—

that of war. Time and again the political departments of the United States recognized this State as having no republican form of government claiming existence under the Federal Constitution, or allegiance to that Government. And the political departments of the so-called Confederate States Government—the then organized power of the people of this State—recognized no such relationship; but declared the United States, and all the citizens of the loyal States, enemies, their property subject to confiscation, &c., &c.

The Convention of 1864, which framed the organic law of the provisional State Government, declared the action of the several departments of the State Government, under the Constitution of 1861, void and of no effect, and recognized a State Government existing from 1861 to 1864, but as revolutionary and without authority. The Convention of 1868, that framed the Constitution under which we are acting, did also declare the action of the Convention of 1861 null and void, and that all action of the *State* of *Arkansas*, under the authority of said Convention, of its ordinances or its Constitution, whether legislative, executive, judicial or military, was void; that no debt incurred under any department of *that government* shall ever be obligatory, &c., only acdnowledging the existence of an organized power which was revolutionary and without authorty; which was not a government, under the Constitution of the United States, but opposed thereto. We then have the political departments of all the governments, the revolutionary, the provisional, the State, and the national, concurring in the declaration that the government once guaranteed to the State by the United States, had been displaced, and did not then exist. Hence it became the duty, under the obligations imposed upon the Federal Government by her Constitution, to take all such action as was necessary to break down the revolutionary powers then in control of the State, and to restore to her, or form for her, a government republican in form; and it must, from the very necessity of the case, be left to the Federal Government, and to the department cognizable of such affairs, to

26

determine the means requisite to reëstablish such government, or to aid well disposed citizens of the State so to do; and for that purpose, the Congress enacted various laws, the one in question, the Civil Rights Bill, being among the most prominent.

The State of Arkansas being, by the Federal authorities, declared in rebellion and war with the United States, and her constitutional government set aside, she then became subject to the armed power of the Federal Government, and, being reduced by that power, she was then left without any legally constituted State Government, and could have none until one was restored to her by Federal authority, or formed under its sanction.

During the clash of arms, as well as upon the weakening or breaking down of the rebellious powers, the United States could have allowed all such courts and such civil proceedings as she deemed best, and proceedings of military, quasi-military or provisional courts, as valid, so far as the same were properly recognized by the Government.

Preparatory to a thorough organization of a legal State Government, the authorities of the United States did allow, maintain, and recognize a provisional government and courts; not a government, independent of the United States, nor even one under a constitution approved by her; but it was a government sanctioned, allowed, and maintained for the time being, and binding in its authority, though subject to be set aside or continued, as the Federal authorities might determine best. These consequences naturally flowed from the results of war; the State was therefore peculiarly subject to the laws of the General Government, and the Government, acting under her constitutional authority to suppress insurrections, secure to the State a republican form of government, and to pass such laws as were for the common good and general welfare of the United States, and as a means of restoration, did declare by law, in the act aforesaid: (*U. S. Statutes, p.* 27, *of the* 1*st ses.,* 38 *Cong., ap. April* 9, 1866:) "That all persons born in the United States, (not Indian, or subject to a foreign power,) are citizens of the United

States; and such citizens, of every race and color, and without regard to previous condition, &c.; shall have the same right in every State and Territory, to make contracts, &c.; to sue, be parties, and give evidence, &c.; and to enjoy full and equal benefit of all laws and proceedings, for the security of person and property, as enjoyed by white citizens, &c., any statutes or law to the contrary notwithstanding."

And this case, wherein Armstead, a colored man, is alleged to have been assaulted and feloneously robbed, is clearly within the class provided for in that act; and the provisional courts of the State, acting under the direct permission and sanction of the Federal Government, were certainly bound to respect and obey her laws, and especially would their attention be called to acts like this, necessary to meet the changed condition of society, and intended as a means of aiding in the restoration of a State republican form of government.

We are, therefore, of the opinion that the circuit court did not err in allowing colored witnesses, of African descent, to make evidence against the appellant, and the judgment of that court is in all things affirmed.

McClure, J., dissenting, says:

It appears from the record that Kelley, a white man, robbed a negro by the name of Armstead, for which he was tried and convicted.

The cause, as we understand it, never did present but one question, and that is whether the negro person who testified on the trial of this cause, was a competent witness. The lapse of time, the adjudication of other tribunals, that we respect, and the progress of events, have passed with such rapid and unerring certainty to the establishment of the right of the negro to testify against the white man who robs him, that our decision, so far as the public or the rights of either of the parties are concerned, is a matter of no consequence.

Kelley has long since been pardoned, and, of course, has no interest in the decision of this case. The right of negro per-

sons to testify in the courts of the State is now no longer an unsettled question, and the public mind and inferior courts have long since recognized the principle of law, and the only one that the disposition of this case ever could have settled.

If the rights of any individual hinged on the result of this case, or the restrictions placed over the liberty of any citizen would be removed by an elaborate discussion of the question involved in this case, we could approach the subject feeling that we were not discussing the abstract issues of the dead past.

When courts establish great and new principles of law, that will control the subsequent adjudications of the future, it is but natural that the enunciation of those principles should go to the world with the reasons that led to their production; but when the people themselves, acknowledging the wrong and injustice under which persons of African descent were laboring, sent their delegates into convention to remedy the great wrong, and when they again, in the exercise of their assembled wisdom, declared, when they adopted the Constitution, that "the equality of all men before the law is recognized, and shall ever remain inviolate," we feel it our duty to stand with uncovered heads before our sovereigns and bow with deference to their wisdom, and excuse ourselves from discussing whether Congress derived the power to pass the Civil Rights Bill from the clause empowering them "to establish a uniform rule of naturalization;" or, from the clause declaring "the citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States;" or, from the clause requiring "the United States to guarantee to every State in the Union a republican form of government;" or, from the preamble to the Constitution, declaring it to be the object of the Government "to establish justice, insure domestic tranquillity, * * * to promote the general welfare and *secure* the blessings of LIBERTY."

We are aware that this case presents a fine opening for the discussion of all these questions; but inasmuch as the liberty of Kelley or the right of the negro to testify, are matters that

are no longer dependent upon an adjudication, and inasmuch as it is not likely that another case involving this same question will ever again arise in this State, we content ourselves by saying, we entertain no doubts on the right or power of Congress to pass the Civil Rights Bill, and that it is constitutional; and, being so, we have no hesitation in saying the negro was a competent witness against Kelley.

We concur in the affirmance of the judgment; and, under the peculiar circumstances attending this case, decline expressing any opinion as to what particular clause Congress derived the power to pass the law; not that we would feel any hesitancy or delicacy about so doing, but because we are unable to see wherein Kelley, or the negro, or the public, would be benefited by learning our individual views on a subject that now is without interest.